CODE:
ACTING IN PRO SE
Glenn Galvan
7866 Morgan Pointe Circle
Reno, NV 89523
(775)-997-2097
Pro Se

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

GLENN GALVAN,

        **Plaintiff,**

   vs.

        **Defendants**

Mortgage Electronic Registration Systems

(MERS), Deutsche Bank National Trust

Company (DBNTC); Beneficiaries, other

related Loan Servicers; et al., and Does 1

through 100, inclusive,

_____

**Case No.: 3:15-cv-00632-RCJ-VPC**

**PLAINTIFF'S MOTION FOR JUDICIAL NOTICE**

    COMES NOW, Plaintiff, GLENN GALVAN, acting in PRO SE,  pursuant to Federal Rule of Evidence 201 along with the civil standard of the "preponderance of the evidence",  the Plaintiff hereby request that the Court take judicial notice of the following in further support of the plaintiff's complaint and in the prosecution of this case.

1.   This court takes judicial notice (Exhibit 2) a case out of Ohio,  Aurora Loan Services v. Louis, 2012-Ohio-384 in which the court concluded that Theodore Schultz is/was an employee of Aurora Loan Services.  See **Exhibit 2 on Page 9 at 21** "*Moreover, Schultz's position as assistant vice president of Aurora does not create a presumption that he had personal knowledge of the assignment.*"

2.   This court takes Judicial notice on the case 3:13-cv-0234-MMD-WGC that on an order issued on August 29, 2014 (See **Exhibit 3 on page 3 and 4**) that the new discovery of Mr. Theodore Schultz by the plaintiff was presented as new evidence. "*discovered that the Deed of Trust assignment by Aurora Loan*"

*Services was alleged to be fraudulent, thus defective, as the deed of trust was signed by alleged*

*unauthorized personnel." (Id.)* **Based on this evidence,** *Plaintiff contends"* .

3. This court takes judicial notice of a document **(See Exhibit 4)** from the Office of the Comptroller of Currency addressed to the plaintiff describes a notice that was sent to all affected homeowners from certain banks affecting their properties that *"Mortgage Servicers have hired an independent consultant to review certain residential foreclosures notions to determine whether an individual borrower was financially injured as a result of any errors, misrepresentations or other deficiencies made during the foreclosure process."*

4. This court takes judicial notice in a case in the Rhode Island Supreme court Chhun v. MERS, 2012-298-Appeal, **(See Exhibit 5 on Page 6 of the order)**, where MERS are named as defendants had knowledge of the allegations that Theodore Schultz was signing the assignments of the Deed of Trust as vice president of MERS on properties where Mr. Schultz did NOT have authorization to.

> *"Paragraph 12 of the complaint alleges: On or about September 10, 2010, MERS attempted to assign this Mortgage to Aurora. * * * Theodore Schultz signed. Theodore Schultz had no authority to assign. Thus, the plaintiffs have alleged that the one person who signed the mortgage assignment did not have the authority to do so. This allegation is buttressed by other allegations in the complaint. Paragraph 13 states that Theodore Schultz was an employee of Aurora, not a Vice-President or Assistant Secretary of MERS. Paragraph 17 alleges that MERS did not order the assignment to Aurora.µ Finally, paragraph 19 contends that no power of attorney from MERS to either Theodore Schultz or Aurora is recorded and referenced in the subject assignment. These allegations, if proven, could establish that the mortgage was not validly assigned, and, therefore, Aurora did not have the authority to foreclose on the property."* **See Page 6 of the order on Exhibit 5**

5. This court takes judicial notice on **Exhibit 6** on the Consent Orders issued by the Board of Governors of the Federal Reserve on April 13, 2011 relating to unsound and unsafe practices perpetrated by MERS. Take notice of Article II (#1 thru 5) on the specifics on the unsafe and unsound practices.

> *"(a) have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; and*
> *(b) have failed to establish and maintain adequate internal controls, policies,*

*and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members."*

**6.**    This court take judicial notice on similar court cases throughout the country with same allegations and facts surrounding Mr. Schultz that MERS knew of their own and Aurora's "unsafe and unsound" business practices.    Rode case referenced below have Theodore Schultz as a defendant.

**A.**    Rode at al v. Borrower Claims Trust et al, 1:16-ap-01015-mg,  Southern  District of New York

**B.**    Chhun v. MERS,  2012-298-Appeal,  Rhode Island Supreme Court

**C.**    Galvan v. Aurora Loan Services, MERS et al, 3:13-cv-0234-MMD-WGC

## MEMORANDUM OF POINTS AND AUTHORITIES

Under Federal Rule of Evidence 201(d),  judicial notice may be taken at any stage of the proceeding, Fed. R. Evid.201(d);  see also Lowry v. Barnhart, 329 F.3d 1019, 1024 (9th Cir. 2003);  Bryant v. Carleson,444 F.2d 353, 357-58 (9th Cir. 1971);  Circuit Advisory Committee Note Seven to Ninth Circuit Rule 27-1. The Court may take judicial notice of any matter *"not subject to reasonable dispute because it:(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."* Fed.  R.  Evid.  201(b).  Furthermore, A court may take judicial notice of figures contained in official documents, including documents appearing on a government website. See, e.g., Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998-99 (9th Cir. 2010).

The plaintiff exhibits contained herein just about all of them were from government websites for the exception of the correspondence from the Office of the Comptroller of Currency (OCC) where that documentation was sent to the plaintiff directly from the OCC. All declarations that the evidence are authenticated are attached to the affidavit in **Exhibit 1**.

The justification for the judicial notice in Exhibit 2 is relevant in this case as there is an undisputed fact that Mr. Schultz was an employee of Aurora Loan Services where Mr. Schultz executed Galvan's assignment of the Deed of Trust as Vice President of MERS onto his property in order to execute a judicial foreclosure. The plaintiff alleges that the assignment is a fabrication containing inaccuracies and misrepresentations, created to

– 3 –

support the illusion that MERS had any remaining authority to transfer the Galvan's NOTE and Deed of Trust to AURORA, that AURORA was a new party in interest and that AURORA therefore had standing to enforce the foreclosure onto the plaintiff's property.

**Exhibit 3** is relevant to this case as this court recognized that the new discovery Galvan made on Mr. Schultz on March 3, 2014 was considered "evidence" on the court's eyes in that previous case 3:2013-cv-0234-MMD-WGC where MERS was named as defendants and had knowledge of Mr. Shultz.

**Exhibit 4** illustrates that OCC of the Federal reserve were informing affected home owners that includes the plaintiff if they had mortgages with certain banks including ones from Aurora Loan Services their documentation purported to have *"errors, misrepresentations or other deficiencies made during the foreclosure process."* Unlike MERS, the OCC communicated and warned affected homeowners of these potential *"errors, misrepresentations or other deficiencies"* where MERS had a lawful duty to speak.

In **Exhibit 5** MERS are named as defendants and that court case in Rhode Island Supreme Court were specific on the allegations and facts surrounding of Mr. Schultz signing on the assignment purported to be a Vice President of MERS.

In Exhibit 6 Illustrates the consent orders from the OCC where MERS had a knowledge of certain unsound and unsafe practices. The Agencies have identified certain deficiencies and unsafe or unsound practices by MERS and MERSCORP that present financial, operational, compliance, legal and reputational risks to MERSCORP and MERS, and to the participating members, along with the homeowners such as in this case.

The plaintiff asserts here that the judicial notice for each of the above are either *not subject to reasonable dispute because it:(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.".*

## CONCLUSION

The plaintiff requests the court to take judicial notice on the above items herein.

The undersigned declares and certifies under penalty of perjury that the foregoing is true and correct.

Executed on 12th of May 2016

Glenn Galvan
Pro Se
7866 Morgan Pointe Circle
Reno, NV 89523

1

2                           <u>**Certificate of Service**</u>

3

This, <u>**Plaintiff's Motion for Judicial Notice**</u> and separate exhibits if applicable, copies have been sent to

4

the United States District Court on May 12, 2016 parties on CM/ECF will receive copies.

5

6   May 12, 2016.

7   ┌─────────────────────────────────┐
    │ Ballard Spahr                   │
8   │ 100 North City Parkway,Ste 1750 │          Glenn Galvan
    │ Las Vegas, NV 89106             │          Pro Se
9   │ Attn: Joseph Sakai(Counsel for  │          7866 Morgan Pointe Circle
    │ MERS and DBNTC)                 │          Reno, NV 89523
10  └─────────────────────────────────┘

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**Table of Exhibits**</u>

**Exhibit 1——Affidavit of Authenticity of Evidence—————————— 2 pages**

**Exhibit 2——Opinion Aurora v. Louis, 2012-384Ohio ————————— 15 pages**

**Exhibit 3——Order Galvan v. Nationstar et al, —————————————— 5 pages**

**Exhibit 4—— OCC Mailing to the Plaintiff——————————————————— 4 pages**

**Exhibit 5—— Opinion Chhunn v. MERS, RI Supreme Court ——————— 9 pages**

**Exhibit 6——OCC Consent Order for MERS——————————————————— 31 pages**

# EXHIBIT 1

# EXHIBIT 1

## AFFIDAVIT ON THE AUTHENTICITY OF EVIDENCE

UNITED STATES OF AMERICA )
STATE OF NEVADA            )
COUNTY OF WASHOE           )

I, Glenn Galvan, declare and certify under penalty of perjury that the foregoing is true and correct in in regards to the authenticity of evidence shown in Exhibits 2-6 of this motion which are pursuant to 28 U.S.C. § 1746.

1.  I, Glenn Galvan, declares I am the Plaintiff and party in this case in the United States District Court, District of Nevada.

2.  I, Glenn Galvan, declares I am a United States Citizen, Born in North Carolina, a resident of Nevada in the County of Washoe residing in the city of Reno.

3.  I, Glenn Galvan, declare that the new evidence in **Exhibit 2** in this response was downloaded from a government website of Ohio Supreme Court. *Aurora Loan Services, LLC v. Dion T. Louis, et al.; Website No: 2012-Ohio-384;* Website URL: *http://www.supremecourt.ohio.gov/rod/docs/pdf/6/2012/2012-ohio-384.pdf* The evidence is a court order and opinion in particular on an affidavit signed by Theodore Schultz. The opinion used in this response is to validate the statement of fact that Theodore Schultz was NOT an employee of Mortgage Electronic Registration Systems (MERS) but of Aurora Loan Services.

4.  I, Glenn Galvan, declare that **Exhibit 3** is the order issued by by Judge Du in this court for case no:3:13-cv-0234-MMD-WGC on August 29, 2016. This order was downloaded from PACER Website: https://www.pacer.gov/.

5.  I, Glenn Galvan, declare that **Exhibit 4** was the document sent to the plaintiff in this case by the Office of the Comptroller of Currency on about October of 2012.

6.  I, Glenn Galvan, declare that the order in **Exhibit 5** was downloaded from a government website of Rhode Island Supreme Court; Chunn v. MERS, No. 2012–298–Appeal (RI, Feb 3, 2014) Website URL: https://www.courts.ri.gov/Courts/SupremeCourt/Opinions/12-298.pdf    The evidence is a court order and opinion in particular illustrating that MERS had knowledge of Theodore Schultz. (See page 6).

7.  I, Glenn Galvan, declare that the consent order in **Exhibit 6** was issued by the Board of Governors of the

Federal Reserve on April 13, 2011 and was downloaded from a government website, Office of Comptroller of

Currency (OCC) website: http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47h.pdf

This consent order will detail specific unsafe and unsound practices of MERS.

I declare and certify, under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

**Executed this 12ᵗʰ Day of May 2016**

Glenn Galvan
Pro Se
7866 Morgan Pointe Cir.
Reno,NV 89523

# EXHIBIT 2

# EXHIBIT 2

[Cite as *Aurora Loan Servs., L.L.C. v. Louis*, 2012-Ohio-384.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Aurora Loan Services, LLC                     Court of Appeals No. L-10-1289

       Appellee                                  Trial Court No. CI0200905312

v.

Dion T. Louis, et al.                         **<u>DECISION AND JUDGMENT</u>**

       Appellant                                 Decided:  February 3, 2012

* * * * *

Darryl E. Gormley, for appellee.

Brandon S. Cohen, for appellant.

* * * * *

**YARBROUGH, J.**

## I. INTRODUCTION

{¶ 1} Appellant Dion T. Louis appeals from a judgment of the Lucas County Court of Common Pleas, which granted summary judgment in favor of appellee, Aurora Loan Services, LLC ("Aurora"), and denied appellant's cross-motion for summary judgment.  Thereafter, the trial court entered a judgment and decree of foreclosure and ordered the property sold.  For the reasons that follow, we reverse.

## A.  Facts and Procedural History

{¶ 2}  On April 16, 1999, appellant entered into a contract with Mayflower d.b.a. Republic Bancorp Mortgage, Inc. to purchase a property located in Toledo, Ohio. Appellant signed a note that contained a promise to pay $33,750 plus interest at the rate of 10.825 percent per annum.  In exchange, Mayflower received a mortgage against the property as security for repayment of the note.  The mortgage was later assigned to Mayflower d.b.a. Union Mortgage Services, and the assignment was recorded on October 13, 1999.  Sometime after 1999, Aurora began to service the loan and appellant made his monthly payments to it.

{¶ 3}  In early 2009, appellant stopped making payments on the loan.  Aurora contends that appellant's default enabled them to exercise an "option" clause contained in the note and mortgage to accelerate the debt.  On July 6, 2009, Aurora filed an action for repayment of the note and foreclosure on the mortgage.  Aurora attached copies of the note and mortgage to its complaint.  Both the note and mortgage were endorsed by and made payable to Mayflower.  There was no mention of Aurora on either document.  In addition, Aurora requested that the trial court declare it a real party in interest as the holder of the note and mortgage.  Aurora also submitted a preliminary judicial report which revealed that the assignment of the mortgage from Mayflower to Aurora was not recorded, and an attempted recording on January 13, 2006, revealed that the chain of title was defective.

2.

{¶ 4} On September 22, 2009, appellant answered the complaint and raised six affirmative defenses, including that Aurora failed to state a claim upon which relief could be granted.

{¶ 5} On December 7, 2009, Aurora filed a motion for summary judgment in which it included an affidavit submitted by Cheryl Marchant, the vice president of Aurora. The affidavit states that Aurora exercised the "option" contained in the mortgage and note which were attached to the pleadings and had accelerated and called due the entire principal balance. The affidavit also declares that Marchant was authorized to make the affidavit and that she possessed personal knowledge of all of the facts therein.

{¶ 6} On December 28, 2009, appellant moved for summary judgment and filed a memorandum in opposition to Aurora's motion for summary judgment based on the contention that Aurora lacked standing as a real party in interest. Appellant argued that Aurora's first affidavit omitted the chain of title issues and did not address the issue of an assignment from Mayflower to Aurora. In response, on January 29, 2010, Aurora filed a brief in opposition to appellant's motion for summary judgment, stating that Mayflower had intended to assign the mortgage to Aurora but the assignment was lost or unrecorded.

{¶ 7} Attached to its brief in opposition to appellant's motion for summary judgment is an affidavit by Theodore Schultz, the assistant vice president of Aurora, as to the lost assignment of the mortgage. This second affidavit states that "[t]he Original Lender assigned its right, title and interest in the note to Mayflower * * * [w]hereas Mayflower assigned its right, title and interest in the note to Aurora." The affidavit goes

3.

on to state that "[t]he original assignment of the Open-end Mortgage between Mayflower DBA Union Mortgage Services and Aurora Loan Services has been lost and or was not recorded."  The affidavit does not assert that Schultz had personal knowledge of the matters stated in the affidavit, nor does it provide the circumstances by which Schultz may have gained personal knowledge of the assignment.  Since Mayflower is now out of business, Schultz asserts that a replacement assignment to confirm that it is the proper holder of the mortgage is unattainable.  Schultz further asserts that Aurora is the holder of the promissory note in question.

{¶ 8} After considering the motions and affidavits, the trial court granted summary judgment in favor of Aurora on August 30, 2010, in the amount of $30,472.27 plus interest on the principal amount at the rate of 10.825 percent per annum from January 1, 2009.  In addition, the court found that Aurora had a valid lien and ordered the foreclosure of the property.  The trial court reasoned that Aurora established its prima facie case when it submitted the affidavits as evidence.  In so determining this, the trial court found that the burden shifted to appellant to show the existence of a genuine issue of material fact pursuant to Civ.R. 56(C).  The trial court concluded that appellant "fail[ed] to bring any [additional] evidence under Civ.R. 56(C) to show a genuine issue of material fact" and denied appellant's cross-motion for summary judgment.

4.

### B.  Assignments of Error

{¶ 9} Appellant now appeals, asserting the following assignment of error:

The trial court erred in granting plaintiff-appellee's motion for summary judgment because it failed to demonstrate that it is entitled to judgment as a matter of law; the unrefuted Civ.R. 56 Evidence demonstrates, at the least, that a genuine issue of material fact exists as to whether plaintiff appellee is the equitable party in interest.

## II. ANALYSIS

### A.  Standard of Review

{¶ 10} When reviewing a trial court's summary judgment decision, the appellate court conducts a de novo review. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment will be granted when there are no genuine issues of material fact, and when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 66-67, 375 N.E.2d 46 (1978).

{¶ 11} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt,* 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). The moving party must point to some evidence in the record of the type listed in Civ.R. 56(C). *Id.* at 292-293. The evidence permitted to be considered is limited to the "pleadings, depositions, answers to interrogatories,

written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action * * *." Civ.R. 56(C). The burden then shifts to the nonmoving party to provide evidence showing that a genuine issue of material fact does exist. *Dresher* at 293. *See also* Civ.R. 56(E).

## B. Summary judgment improper

### 1. No demonstration that Aurora is the note holder

{¶ 12} In foreclosure actions, the real party in interest is the current holder of the note and mortgage. *See, e.g., Deutsche Bank Natl. Trust Co. v. Greene,* 6th Dist. No. E-10-006, 2011-Ohio-1976, ¶ 13. Civ.R. 17(A) requires that "a civil action must be prosecuted by the real party in interest," that is, by a party "who can discharge the claim upon which the action is brought * * * [or] is the party who, by substantive law, possesses the right to be enforced." (Citations omitted.) *Discover Bank v. Brockmeier,* 12th Dist. No. CA2006-057-078, 2007-Ohio-1552, ¶ 7. If an individual or one in a representative capacity does not have a real interest in the subject matter of the action, that party lacks the standing to invoke the jurisdiction of the court. *State ex rel. Dallman v. Court of Common Pleas, Franklin Cty.*, 35 Ohio St.2d 176, 179, 298 N.E.2d 515 (1973), syllabus.

{¶ 13} In its complaint, Aurora alleged that it is the current holder of the note and mortgage. Nevertheless, the mortgage was not recorded and the title search revealed that the chain of title is deficient. In fact, Aurora admitted this in its complaint and asked the trial court for a declaratory judgment to establish that it is the holder of the note and

6.

mortgage. The only evidence submitted in support of Aurora's motion for summary judgment were the Marchant and Schultz affidavits.

{¶ 14} In determining the sufficiency of these affidavits, we turn to the requirements set forth by Civ.R. 56.

{¶ 15} Pursuant to Civ.R. 56(C),

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule.

{¶ 16} Further, Civ.R. 56(E) provides:

Supporting and opposing affidavits shall be made on *personal knowledge*, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. *Sworn or certified copies* of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit. (Emphasis added.)

{¶ 17} Marchant does not assert or aver to any facts which support a finding that Aurora is the holder of the note or mortgage at issue. In fact, the note filed with her affidavit shows the following endorsement: "PAY WITHOUT RECOURSE TO THE

7.

ORDER OF: LIFE BANK BY: [ILLEGIBLE SIGNATURE] TIMOTHY A MERRITT,

BRANCH MANAGER FOR MAYFLOWER D.B.A. UNION MORTGAGE

SERVICES."  There is no explanation of any facts to illustrate how Aurora became the

holder of the note.  Rather, Marchant's testimony is that "Aurora Loan Services, LLC has

exercised the option contained in the note and mortgage and has accelerated and called

due the entire principal balance due thereon."  This statement fails to establish Aurora as

a real party in interest.

{¶ 18} Next, we turn to the Schultz affidavit and find that it is deficient in

establishing Aurora's status as a holder of the note and mortgage for three reasons.

{¶ 19} First, the Schultz affidavit states that: (1) "Aurora Loan Services LLC is the

holder ('Holder') of the following described promissory note (the 'Note'): * * * Loan No:

0115933855 * * * Borrowers:  Dion T. Louis, an unmarried man * * * Property address:

280 Knower St., Toledo, OH 43609 * * * Amount: $33,750.00;" and (2) "Mayflower

DBA Union Mortgage Services assigned its right, title and interest in the note to Aurora."

A sworn or certified copy of the note was not attached or served with this affidavit as

required by Civ.R. 56(E).

{¶ 20} Second, there is no explanation as to how Schultz came to know this

information or whether he personally presided over appellant's account.  We note,

> [t]he [affiant] need not have firsthand knowledge of the
>
> transaction, but must demonstrate [that] the [affiant] is sufficiently
>
> familiar with the operation of the business and with the

8.

circumstances of the record's preparation, maintenance and retrieval, such that the witness can reasonably testify on the basis of this knowledge that the record is what it purports to be * * *. *Wachovia Bank of Delaware, N.A. v. Jackson*, 5th Dist. No. 2010-CA-00291, 2011-Ohio-3202, ¶ 36, citing *State v. Patton*, 3d Dist. No. 1-91-12, 1992 WL 42806 (Mar. 5, 1992).

{¶ 21} Moreover, Schultz's position as assistant vice president of Aurora does not create a presumption that he had personal knowledge of the assignment from Mayflower to Aurora. For example, in *TPI Asset Mgt. v. Conrad-Eiford*, 193 Ohio App.3d 38, 2011-Ohio-1405, 950 N.E.2d 1018, ¶ 21, the affiant stated that "from my own personal knowledge the following facts are true as I verily believe, and * * * I am competent to testify to same." The *TPI* court held that, regardless of the affiant's position in the bank as team leader, the affidavits failed to demonstrate the particular basis on which the affiants gained their understanding of the facts. *Id.* at ¶ 23. Because the Schultz affidavit does not demonstrate that Schultz had personal knowledge of the assignment to Aurora, it does not meet the requirements for affidavits set forth in Civ.R. 56(E).

{¶ 22} Third, Schultz asserted that Aurora is the holder of the note, but failed to set forth any facts in support of this legal conclusion. Affidavits filed in support of summary judgment containing "inferences and bald assertions" rather than a "clear statement or documentation" proving that the original holder of the note and mortgage transferred its interest to Aurora are not sufficient to support a finding that Aurora is the

9.

holder of the note and mortgage. *See First Union Natl. Bank v. Hufford*, 146 Ohio App.3d 673, 678, 767 N.E.2d 1206 (2001) (inferences and bald assertions are insufficient evidence of a transfer of a note and mortgage). Furthermore, Schultz stated, "Mayflower DBA Union Mortgage Services assigned its right, title and interest in the note to Aurora Loan Services." This statement is contradictory to the endorsement contained on the note which indicates that Mayflower d.b.a. Union Mortgage Services assigned the note to Life Bank.

{¶ 23} Ohio's version of the Uniform Commercial Code governs who may enforce a note. R.C. 1301.01 *et seq.*[1] Article 3 of the UCC governs the creation, transfer and enforceability of negotiable instruments, including promissory notes secured by mortgages on real estate. *Fed. Land Bank of Louisville v. Taggart*, 31 Ohio St.3d 8, 10, 508 N.E.2d 152 (1987).

{¶ 24} Under the code, a "person entitled to enforce" an instrument means any of the following persons: (1) The holder of the instrument, (2) A non-holder in possession of the instrument who has the rights of the holder, (3) A person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 1303.38 or division (D) of section 1303.58 of the Revised Code. R.C. 1301.31.

{¶ 25} More specifically, under former R.C. 1301.01, "holder" means either of the following:

---

[1] R.C. 1301.01 was repealed by Am.H.B. No. 9, 2011 Ohio Laws File 9, effective June 29, 2011. That act amended the provisions of R.C. 1301.01 and renumbered that section so that it now appears at R.C. 1301.201. Because R.C. 1301.201 only applies to transactions entered on or after June 29, 2011, we apply R.C. 1301.01 to this appeal.

10.

{¶ 26} "(a) if the instrument is payable to bearer, a person who is in *possession* of the instrument;

{¶ 27} "(b) if the instrument is payable to an identified person, the identified person when in possession of the instrument." (Emphasis added.)

{¶ 28} Schultz failed to assert any facts indicating that Aurora is entitled to enforce the instrument. On the face of the note, it is impossible for Aurora to be a "holder" as defined by former R.C. 1301.01. The instrument is not bearer paper, and Aurora is not an identified person on the instrument. Thus, Aurora has failed to meet its *Dresher* burden of establishing that it is the current note holder.

## 2. No demonstration that Aurora is the mortgage holder

{¶ 29} "'Holder of the mortgage' means the holder of the mortgage as disclosed by the records of the recorder or recorders of the county or counties in which the mortgaged premises are situated." R.C. 5301.232(E)(3).

{¶ 30} In support of Aurora's motion for summary judgment, Schultz, in his affidavit, stated: "The Loan is secured by an Open-end Mortgage dated 4/16/1999 Book 99 1465 at Page B11 Instrument 24635 in the County of Lucas, State of Ohio." We note that a certified copy of the mortgage assignment was not attached to the Schultz affidavit as required by Civ.R. 56(E). Furthermore, in regards to the mortgage assignments, the preliminary judicial report filed on July 6, 2009, indicates that the mortgage was initially given to Mayflower d.b.a. Republic Bancorp Mortgage Inc., filed April 21, 1999, in File No. 99 1465B11 of the Lucas County Records. Thereafter, the mortgage was assigned to

11.

Mayflower d.b.a. Union Mortgage Services, and filed October 13, 1999, in File No. 99 3915C12 of the Lucas County Records.

{¶ 31} The report goes on to state:

Attempted assignment of mortgage to First Union National Bank as Trustee of the Amortizing Residential Collateral Mortgage Trust 2000-BC1, (by Life Bank), by separate instrument dated April 18, 2001 and filed April 18, 2001 in File No. 01 4794 E01 of Lucas County Records. There is no assignment of mortgage to Life Bank.

Attempted assignment of mortgage to Aurora Loan Services LLC FKA Aurora Loan Services Inc., (by Pacific Premier Bank, FSB, FKA Life Bank, FSB or Life Bank), by separate instrument dated January 13, 2006 and filed March 6, 2006 in file No. 20060306-0013641 of Lucas County Records. *The chain of mortgage assignment is defective.* (Emphasis added.)

{¶ 32} Thus, the record reflects that Aurora is unable to establish that there is no genuine issue of material fact as to whether it is the current holder of the mortgage, given the chain of assignments and transfers of the mortgage.

{¶ 33} Furthermore, courts have been reluctant to rely on affidavits as a basis for granting summary judgment in foreclosure actions where there is an absence of supporting evidence or circumstances. In *DLJ Mtge. Capital, Inc. v. Parsons*, 7th Dist. No. 07-MA-17, 2008-Ohio-1177, ¶ 17, the Seventh District Court of Appeals stated that

12.

summary judgment could not be granted for the mortgagee where there was no evidence of an assignment of the note and mortgage besides an affidavit by an employee. Although the employee presided over Parson's account, the affidavit was deemed insufficient to support a motion for summary judgment because it failed to mention "how, when, or whether appellee was assigned the mortgage and note." *Id.* Similarly, in *First Union*, 146 Ohio App.3d at 679, 767 N.E.2d 1206, the Third District Court of Appeals declined to grant summary judgment based exclusively on an affidavit where there was no evidence of an assignment to the mortgagee. The court stated that "though inferences could have been drawn from [the affidavit], inferences are inappropriate, insufficient support for summary judgment and are contradictory to the fundamental mandate that evidence be construed most strongly in favor of the nonmoving party." *Id.* However, where other evidence of a transfer exists, such as a valid transfer of one instrument as evidence of the other, courts have relied on affidavits to confirm such facts. *See, e.g., Greene*, 6th Dist. No. E-10-006, 2011-Ohio-1976, at ¶ 15. In *Greene*, we held that the assignment of the mortgage, in conjunction with interlocking references in the mortgage and the note, transferred the note as well. We cannot find the same here. As in *DLJ Mtge.* and *First Union*, the affidavits in this case were the only evidence that a transfer of the note and mortgage occurred. As discussed, these affidavits fail to establish Aurora as the holder of either the note or the mortgage.

{¶ 34} We note that appellant also argues in his first assignment of error that, "[u]nder statute of frauds principles, Plaintiff-Appellee's would have to show a signed

13.

'option' or 'assignment' from Lender – Mortgage Holder – to be the real party in interest against Louis." To support his argument, appellant claims that "without a signed document expressly granting Aurora an assignment in the mortgage to Louis' property – the trial court cannot grant summary judgment based solely on Aurora's (self-serving) affidavit." However, it has been a longstanding rule in Ohio that whenever a promissory note is secured by a mortgage, the note constitutes the evidence of the debt and the mortgage is mere incident to the obligation. *U.S. Bank Natl. Assn. v. Marcino*, 181 Ohio App.3d 328, 2009-Ohio-1178, 908 N.E.2d 1032, ¶ 52, citing *Edgar v. Haines*, 109 Ohio St. 159, 164, 141 N.E. 837 (1923). Thus, a transfer of an obligation secured by a mortgage also acts as an equitable assignment of the mortgage, even though the mortgage is not assigned or delivered. *Kuck v. Sommers*, 59 Ohio Law Abs. 400, 100 N.E.2d 68, 75 (3d Dist.1950). Also, "'[s]ubsection (g) [of U.C.C. 9-203] codifies the common law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien.'" *Marcino* at ¶ 53, quoting Official Comment 9 to U.C.C. 9-203. Thus, there is no requirement that a signed assignment of a mortgage be contained in the record. Finally, both instruments that Aurora seeks to enforce were signed by appellant and an option in the mortgage enables the holder to accelerate the debt upon default. Therefore, we do not believe that the statute of frauds argument is pertinent to this appeal.

{¶ 35} In sum, Aurora submitted affidavits that fail to demonstrate that Aurora is the holder of the note or mortgage. Therefore, we hold that Aurora has failed to satisfy

14.

its initial burden of demonstrating that no genuine issue of material fact exists as to whether it is the real party in interest, and thus, summary judgment is inappropriate.

{¶ 36} Accordingly, appellant's first assignment of error is well-taken.

### III. CONCLUSION

{¶ 37} Because a genuine issue of material fact exists as to whether Aurora is a real party in interest, the judgment of the Lucas County Court of Common Pleas is reversed and this case is remanded to the trial court for further proceedings.  Pursuant to App.R. 24, appellee is ordered to pay costs of this appeal.

<div align="right">Judgment reversed.</div>

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J. _____

_____
JUDGE

Arlene Singer, P.J. _____

Stephen A. Yarbrough, J. _____
CONCUR.

_____
JUDGE

_____
JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.

15.

# Exhibit 3

# Exhibit 3

1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                                 DISTRICT OF NEVADA

8                                        * * *

9    GLENN GALVAN,                              Case No. 3:13-cv-00234-MMD-WGC

10                          Plaintiff,

11        v.                                                ORDER

12   NATIONSTAR MORTGAGE, et al.,

13                          Defendants.

14

15   **I.    INTRODUCTION**

16           Before the Court is Plaintiff's Motion for Relief and Amend of Judgment and

17   Order, and Motion for New Trial ("Motion"). (Dkt. no. 54.) For the reasons discussed

18   below, the Motion is denied.

19           The relevant background facts are recited in the Court's Order from which Plaintiff

20   seeks relief. (Dkt. no. 51.) In that Order, the Court found that it lacks subject matter

21   jurisdiction over this action because Plaintiff's claims are compulsory counterclaims in

22   the Judicial Foreclosure Case[1] and are barred by res judicata.

23           Plaintiff seeks relief from the Order pursuant to Fed. R. Civ. P. 60(a), (b)(1), (3),

24   and (6), and Fed. R. Civ. P. 59(a)-(e). Plaintiff cites to Rule 60(a), but does not appear to

25   _____

26           [1]For ease of reference, the Judicial Foreclosure Case refers to a judicial
     foreclosure action that Defendant Nationstar Mortgage initiated against Plaintiff in the
27   Second Judicial District Court of Nevada. Plaintiff filed an Amended Answer and
     Counterclaims in the Judicial Foreclosure Case. (Dkt. no. 9-1.) Several months later, on
28   May 7, 2013, Mr. Galvan filed this action. (Dkt. no. 1.)

contend that the Court made the type of mistake that the rule covers.[2] Plaintiff also cites to Rule 59(a), (b), (c), and (d), all of which govern a new trial. However, relief relating to a new trial is not available because this case was not tried before a jury or judge. The Court will therefore address Plaintiff's request under Rule 60(b) and Rule 59(e).

## II.   LEGAL STANDARD

The Ninth Circuit has held that a Rule 59(e) motion for reconsideration should not be granted "absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) (*quoting 389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999)) (internal quotation marks omitted).

Under Rule 60(b), a court may relieve a party from a final judgment, order, or proceeding only in the following circumstances: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief from the judgment. *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985). "Relief under Rule 60(b)(6) . . . is available only under extraordinary circumstances." *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981) (citation omitted). A motion for reconsideration must set forth (1) some valid reason why the court should revisit its prior order; and (2) facts or law of a "strongly convincing nature" in support of reversing the prior decision. *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003). On the other hand, a motion for reconsideration is properly denied when the movant fails to establish any reason justifying relief. *See Backlund*, 778 F.2d at 1388 (holding that a district court properly denied a motion for reconsideration in which the plaintiff presented no arguments that were not already raised in his original motion).

---

[2]Rule 60(a) governs corrections based upon a clerical mistake or mistake arising from an oversight or omission.

### III.   DISCUSSION

Plaintiff raises several arguments in his Motion and reply brief to seek relief under Rules 59(e) and 60(b). Two of the arguments relate to the standard for review and dismissal of a pro se litigant's complaint. Plaintiff contends that as a pro se litigant, he is entitled to notice of the deficiencies in his Complaint so he may amend them. He also argues that the Court did not evaluate his claims based on the standard for dismissal announced in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). First and foremost, the Court did review Plaintiff's Complaint under a more liberal pleading standard. (Dkt. no. 51 at 5 n.4.) The Court's decision, however, was not based on any deficiencies in the Complaint that Plaintiff could have cured by amendment. Rather, the Court granted dismissal under Rule 12(b)(1) for lack of jurisdiction. The *Iqbal* standard governs dismissal under Rule 12(b)(6) for failure to state a claim.

Plaintiff next argues that the Court erred by not informing him of LR 7.2's requirements in its October 22, 2013, Order granting his application to proceed in forma pauperis. Plaintiff states that he would have complied with those requirements if he had been aware of them. While the Court must construe Plaintiff's pleadings liberally, Plaintiff, like other pro se litigants, is bound by the rules of procedure and must be familiar with them. *See Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995). More importantly, the Court did not dismiss this case for failure to file a notice of related cases. The fact that Plaintiff did not comply with LR 7.2 had no impact on the Court's Order.

Plaintiff contends that Defendant made several misrepresentations that he planned to raise in a sur-reply, but the Court denied his motion to file a sur-reply. The alleged misrepresentations involve Defendant's mischaracterization of the Judicial Foreclosure Case as an in rem action or as seeking wrongful foreclosure and Defendant's erroneous claim that the Complaint was taken from the Internet. However, the Court's decision was not based on these alleged misrepresentations.

In his reply brief, Plaintiff claims that he "now asserts 'intrinsic fraud.'" (Dkt. no. 56 at 1.) Plaintiff contends that after inspecting the relevant documents once again, "[i]t was

1    newly discovered that the Deed of Trust assignment by Aurora Loan Services was
2    alleged to be fraudulent, thus defective, as the deed of trust was signed by alleged
3    unauthorized personnel." (*Id.*) Based on this evidence, Plaintiff contends "that there is a
4    broken chain of assignments on the Deed of Trust on the 'subject property.'" (*Id.*) Even
5    setting aside that Plaintiff improperly raises this argument for the first time in his reply,
6    Plaintiff's claim still relates to the subject of the Judicial Foreclosure Case, i.e., the
7    origination, servicing, and enforcement of Plaintiff's mortgage loan.

8            As the Court explained in the Order, federal courts are courts of limited
9    jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). The Court
10   dismissed Plaintiff's claim for lack of jurisdiction; the Order did not address any
11   deficiencies that may be cured by amendment or the merits of Plaintiff's claims.
12   Regardless of what Plaintiff alleges, if his claims arise out of the same transaction or
13   occurrence as the subject of the Judicial Foreclosure Case, and if their adjudication does
14   not require the presence of third parties of whom the Court cannot acquire jurisdiction,
15   they amount to compulsory counterclaims under Nevada Rule of Civil Procedure 13(a).
16   Plaintiff is precluded by res judicata from bringing suit upon a compulsory counterclaim
17   because these claims must be raised in the initial action, i.e., the Judicial Foreclosure
18   Action. *See Dragor Shipping Corp. v. Union Tank Car Co.*, 378 F.2d 241, 244 (9th Cir.
19   1967) ("Under Rule 13(a) a party who fails to plead a compulsory claim against an
20   opposing party is held to have waived such claim and is precluded by res judicata from
21   bringing suit upon it again.");[3] *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201
22   (9th Cir. 1982) (finding that the doctrine of res judicata bars "'all grounds for recovery
23   which could have been asserted, *whether they were or not*, in a prior suit between the
24   same parties . . . on the same cause of action'" (emphasis added) (*quoting Ross v.* Int'l
25   *Bhd. of Elec. Workers*, 634 F.2d 453, 457 (9th Cir. 1980))).

26   _____

27           [3]Fed. R. Civ. P. 13(a), referenced here by the Ninth Circuit, is substantively
     identical to Nevada Rule of Civil Procedure 13(a). *See MacDonald v. Krause*, 362 P.2d
28   724, 725 n.1, 727 (Nev. 1961).

4

1    **IV.    CONCLUSION**

2        It is therefore ordered that Plaintiff's Motion for Relief and Amend of Judgment

3    and Order, and Motion for New Trial ("Motion") (dkt. no. 54) is denied.

4        DATED THIS 29th day of August 2014.

5

6

7                                  MIRANDA M. DU
                              UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 4

# Exhibit 4

# Independent Foreclosure Review

November 14, 2012



**Your Request for Review Form has been received.**

Reference Number:    0700146879

Property Address:

7866 Morgan Pointe Cir
Reno NV 89523

*Si usted habla español, tenemos representantes que pueden asistirle en su idioma.*

***** SINGLE PIECE
78127-12-V001-0000007-ACKL-M3106
Glenn Galvan
c/o Glenn Galvan
7866 Morgan Pointe
Reno NV 89523

Dear Glenn Galvan,

We have received a Request for Review Form for the property noted above. If you have requested an Independent Foreclosure Review, your request will now be evaluated to confirm eligibility.

If your request meets the eligibility requirements, it will be reviewed by an independent consultant. Your servicer will provide relevant documents along with any findings and recommendations related to your request to the independent consultant for review. Your servicer may be asked to clarify or confirm facts and disclose reasons for events that occurred related to the foreclosure process. You could be asked to provide additional information or documentation.

The Independent Foreclosure Review will determine if you suffered financial injury as a result of errors or other problems during the foreclosure process. You will receive a letter with the findings of the review and information about possible compensation or other remedy. Because the review process will be a thorough and complete examination of many details and documents, the review could take several months.

Please note, if you do not meet the eligibility requirements or the information you provided was not about errors or other problems during the foreclosure process, we will notify you within 90 days of this letter that your submission will not be reviewed by the Independent Foreclosure Review process.

If you have questions or need a Form by mail, call 1-866-498-6347, Monday through Friday, 8 a.m.–10 p.m. ET or Saturday, 8 a.m.–5 p.m. ET.

Sincerely,

Independent Review Administrator - Rust Consulting, Inc.

An important message authorized by
the Board of Governors of the Federal Reserve System
and the Office of the Comptroller of the Currency

November 13, 2012

Glenn Galvan
7866 Morgan Pointe Cir
Reno, NV 89523-4803

Loan Number: 0021608690
Reference Number: 0700146879
Property Address: 7866 Morgan Pointe Cir
Reno, NV 89523

Dear Glenn Galvan,

We are writing you because your mortgage loan was in the foreclosure process with Aurora Loan Services between January 1, 2009 and December 31, 2010. If you believe foreclosure errors cost you money, you can request a review of your mortgage file by a neutral party. You give up nothing by requesting a review and waive no rights by accepting compensation.

**IF AN ERROR IS FOUND, YOU COULD RECEIVE A PAYMENT OR OTHER COMPENSATION THAT MAY INCLUDE REFUNDED FEES, STOPPING OF A FORECLOSURE OR PAYMENTS UP TO $125,000 PLUS EQUITY.***

The request for review process is free. Federal bank regulators—the Board of Governors of the Federal Reserve System and the Office of the Comptroller of the Currency, a bureau of the U.S. Department of the Treasury—are directing and monitoring the review process.

**Visit IndependentForeclosureReview.com or call 1-866-498-6347 to request a review today. You must submit a Request for Review Form no later than December 31, 2012.**

Sincerely,

Independent Review Administrator - Rust Consulting, Inc.

Si usted habla español, tenemos representantes que pueden asistirle en su idioma para darle información sobre la Revisión Independiente de Ejecución Hipotecaria.

Assistance is also available in over 200 languages, including: Chinese, Korean, Vietnamese, Tagalog, Hmong and Russian.

提供中文幫助。 Помощь на русском языке. Peb muaj cov neeg hais lus Hmoob pab nej.
한국어 도움을 제공합니다. Trợ giúp hiện có bằng tiếng Việt. Available ang tulong sa wikang Tagalog.

*Any payments made to you if errors in your foreclosure are found may be reported to the IRS and may have tax implications. Consult a tax advisor to discuss these implications.

If you are currently represented by an attorney at law with respect to a foreclosure or bankruptcy case regarding this mortgage, please refer this letter to your attorney.

This letter is being sent to you at the request of federal bank regulators. This letter is not an attempt to collect a debt or to impose personal liability for any obligation, including, without limitation, any obligation that was discharged, or is subject to an automatic stay in bankruptcy under Title 11 of the United States Code.

The information that you submit in connection with the Independent Foreclosure Review process will be available to the servicer(s) of your mortgage loan and will be shared with an independent consultant of that servicer(s). Where required to comply with the law, the servicer(s) may be compelled to provide this information in response to a legal process.

Under the April 13, 2011 Consent Order, governing the Independent Foreclosure Review, the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System have also directed servicers to use contact or personal information provided by the borrower in connection with the Independent Foreclosure Review only for purposes relating to the Independent Foreclosure Review process, including remediation efforts or other borrower communications.

If you would like the servicer's internal records to include updated contact or personal information that you provide in connection with the Independent Foreclosure Review process for the servicer's future correspondence or notices outside the Independent Foreclosure Review, then you must separately provide your new contact or personal information directly to the servicer.

The servicer may always use information obtained from publicly or commercially available sources to update borrower contact or personal information.

Llame al 1-866-498-6347 para hablar con un representante que le podrá brindar gratuitamente traducciones de la información que le envió la Revisión Independiente de la Ejecución Hipotecaria y responder a sus preguntas acerca de la Revisión Independiente de la Ejecución Hipotecaria o completar el Formulario de Solicitud de Revisión. Esta información es precisa a la fecha de impresión y está sujeta a cambios sin previo aviso.

Call 1-866-498-6347 to speak to a representative that will be able to provide free translations of information sent to you from the Independent Foreclosure Review and answer your questions about the Independent Foreclosure Review or completing the Request for Review Form. This information is accurate as of date of printing and is subject to change without notice.

Assistance is available in over 200 languages, including: Chinese, Korean, Vietnamese, Tagalog, Hmong and Russian.

提供中文翻译。

한국어 도움을 제공합니다.

Trợ giúp hiện có bằng tiếng Việt.

Available ang tulong sa wikang Tagalog.

Peb muaj cov neeg hais lus Hmoob pab nej.

Помощь на русском языке.

**Consent Order Details**

As part of consent orders issued on April 13, 2011 between certain residential mortgage servicers and their federal bank regulators, an Independent Foreclosure Review is being made available to individual borrowers who were part of a foreclosure action on their primary residence during the period of January 1, 2009 to December 31, 2010. Pursuant to the consent orders, each mortgage servicer has hired an approved independent consultant to review certain residential foreclosure actions to determine whether an individual borrower was financially injured as a result of any errors, misrepresentations or other deficiencies made during the foreclosure process.

The Independent Foreclosure Review is monitored by federal bank regulators from the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System.

# Frequently Asked Questions and Answers

**What is the deadline to submit my Request for Review Form?**

It must be postmarked or submitted online no later than December 31, 2012.

**How do I know this is legitimate?**

You can go to the federal regulators' websites to learn more about the purpose and the guidelines of the Independent Foreclosure Review.

> Office of the Comptroller of the Currency a bureau of the U.S. Department of the Treasury:
> Search for the Independent Foreclosure Review at occ.treas.gov
> or go directly to occ.gov/independentforeclosurereview
>
> Board of Governors of the Federal Reserve System
> Search for the Independent Foreclosure Review at federalreserve.gov
> or go directly to federalreserve.gov/consumerinfo/independent-foreclosure-review.htm

**How do I know if I am eligible for the Independent Foreclosure Review? What determines if I am eligible for an Independent Foreclosure Review?**

To be eligible for the Independent Foreclosure Review, your mortgage loan must meet the following initial eligibility criteria:

- Serviced by one of the participating mortgage servicers
- Active in the foreclosure process between January 1, 2009 and December 31, 2010
- Your primary residence

**Do I qualify for a review even if my house did not go all the way through a foreclosure sale?**

Yes, your mortgage loan may qualify even if your property did not go all the way through foreclosure sale. This could mean that you are still living in the home.

**If I request an Independent Foreclosure Review, is there a cost?**

No, there is no cost. The Independent Foreclosure Review is a free program. But beware of anyone who asks you to pay a fee in exchange for a service to complete the Request for Review Form.

**Does submitting a Request for Review Form prevent me from taking other action against my servicer?**

No. Filing a request for an Independent Foreclosure Review will not prevent you from any other options you may take now or in the future related to your foreclosure.

**Will my credit be hurt if I have a review?**

No, the Independent Foreclosure Review will not impact your credit report.

**What if I am working with my servicer on, or I have been approved for, a modification or another option to avoid foreclosure?**

The Independent Foreclosure Review is a separate review of your mortgage loan file. A Request for Review will not impact any other options you may be approved for or may be working on with your Servicer.

**If I have already submitted a complaint to my servicer, do I need to submit a separate Request for Review Form to participate in this process?**

Yes, the Request for Review Form must be completed to the best of your ability to be considered for the Independent Foreclosure Review process.

**Will I need an attorney to submit a Request for Review Form?**

No. However, if you are currently represented by an attorney at law with respect to a foreclosure or bankruptcy case regarding this mortgage loan, please refer this letter to your attorney.

# Exhibit 5

# Exhibit 5

**Supreme Court**

**No. 2012-298-Appeal.**
**(PC 11-4547)**

William Chhun et al.                    :

v.                          :

Mortgage Electronic Registration Systems,    :
Inc., et al.

<u>NOTICE</u>:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2012-298-Appeal.
(PC 11-4547)

William Chhun et al.                    :

v.                                      :

Mortgage Electronic Registration Systems,    :
Inc., et al.

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on December 10, 2013, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be decided summarily.  The plaintiffs, William Chhun and Joli Chhim (plaintiffs), appeal from a Superior Court judgment granting the motion to dismiss of the defendants, Mortgage Electronic Registration Systems, Inc. (MERS),[1] Domestic Bank (Domestic), Aurora Loan Services, LLC (Aurora), and Deutsche Bank National Trust Company (Deutsche Bank) (collectively, defendants).  After considering the written and oral arguments advanced by counsel, we are satisfied that cause has not been shown and that this appeal may be decided at this time.  For the reasons set forth below, we vacate the judgment of the Superior Court.

---

[1] For more information on the role of MERS in the mortgage industry, see Bucci v. Lehman Brothers Bank, FSB, 68 A.3d 1069, 1072-73 (R.I. 2013).

- 1 -

**Facts and Travel**

On a motion to dismiss, the facts are gleaned from the complaint; we assume all of the allegations in the complaint are true and resolve any doubts in favor of the plaintiff. See Narragansett Electric Co. v. Minardi, 21 A.3d 274, 278 (R.I. 2011). On April 24, 2006, William Chhun and Joli Chhim executed a mortgage (the mortgage) on 11 Wakefield Avenue in Cranston. The mortgage identified plaintiffs as "Borrower," Domestic as "Lender," and MERS as "a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns."[2]

On September 10, 2010, MERS purported to assign the mortgage to Aurora. The Corporate Assignment of Mortgage (the assignment) is endorsed by MERS, "as nominee for Domestic Bank [its] Successors or Assigns." It is signed by "Theodore Schultz, Vice-President" (Schultz). The complaint, however, alleges that Schultz "had no authority to assign" the mortgage. More specifically, plaintiffs allege that Schultz was "an employee of Aurora, not a Vice-President or Assistant Secretary of MERS." Furthermore, plaintiffs allege that MERS did not order the assignment to Aurora.[3]

On August 5, 2011, plaintiffs filed a three-count complaint, seeking a declaratory judgment, quiet title, and punitive damages. The complaint alleges that both MERS and Aurora attempted to invoke the power of sale. Although the complaint does not provide any details about the foreclosure process, it does allege that "Aurora or the successful bidder at the

---

[2] Although not attached to the complaint, a later filing includes a copy of an adjustable rate note also signed by William Chhun on April 24, 2006, promising to pay $224,000 in principal plus interest to Domestic.

[3] The plaintiffs also allege that "[t]he assignment from MERS to Aurora is void due to failure of consideration."

- 2 -

foreclosure sale took a foreclosure deed."[4]  The plaintiffs requested, inter alia, that the court declare that the assignment is void, that the foreclosure sale is void, and that plaintiffs own a fee simple interest in the property.

The defendants moved to dismiss the complaint in accordance with Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, alleging that plaintiffs lacked standing to challenge the assignment of the mortgage and that plaintiffs failed to state a claim upon which relief can be granted.  The plaintiffs responded with a lengthy pleading in opposition to defendants' motion.  The Superior Court justice granted the motion to dismiss, concluding that plaintiffs did not have standing to seek relief based on the assignment because they were neither an assignor nor an assignee of the assignment.  Alternatively, he also concluded that, even if plaintiffs did have standing, they had "failed to allege facts in their Complaint which 'raise a right to relief above the speculative level,'" quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Superior Court justice further stated that Aurora properly was the mortgagee prior to the commencement of foreclosure proceedings and that the identity of the note holder was irrelevant.

### Standard of Review

The articulation of the standard of review on a motion to dismiss was raised as an issue in this case.  Under this Court's traditional explication of the standard, a Rule 12(b)(6) motion to dismiss should be granted only "when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim." Palazzo v. Alves, 944 A.2d 144, 149-50 (R.I. 2008) (quoting Ellis v. Rhode Island Public Transit Authority, 586 A.2d 1055, 1057 (R.I. 1991)); see also McKenna v. Williams, 874 A.2d 217, 225 (R.I. 2005) ("[I]t is our function to examine the

---

[4] In their Rule 12A counterstatement, defendants contend—without citation—that Aurora conducted a foreclosure sale on August 3, 2011.

- 3 -

complaint to determine if plaintiffs are entitled to relief under any conceivable set of facts."). In undertaking this review, we are "confined to the four corners of the complaint and must assume all allegations are true, resolving any doubts in plaintiff's favor." Minardi, 21 A.3d at 278.

Generally, this Court looks to Federal jurisprudence for guidance or interpretation of Rule 12(b). See Hall v. Kuzenka, 843 A.2d 474, 476 (R.I. 2004) ("[W]here the Federal rule and our state rule are substantially similar, we will look to the Federal courts for guidance or interpretation of our own rule." Quoting Heal v. Heal, 762 A.2d 463, 466-67 (R.I. 2000)). Additionally, we have noted that "Rhode Island Rule 12(b) is nearly identical to Rule 12(b) of the Federal Rules of Civil Procedure." Hall, 843 A.2d at 476-77. In recent years, however, the Federal courts have significantly altered their interpretation of the standard of review applicable to a motion to dismiss, and the Superior Court justice in this case relied on that interpretation. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555. Under this standard, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a plaintiff must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570.[5] "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Significantly, "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." Iqbal, 556 U.S. at 686. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."

---

[5] In Twombly, the Supreme Court stated that the "no set of facts" language originating in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)—and on which this Court's articulation of the traditional Rhode Island standard is based—"has earned its retirement." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 562, 563 (2007). Thus, it is clear that the new Federal standard cannot be blended with the traditional Rhode Island standard.

Id. at 679. "Determining whether a complaint states a plausible claim for relief * * * [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted).

This Court has not yet addressed whether continued adherence to our traditional Rhode Island standard is appropriate or whether the new Federal guide of plausibility should be adopted. However, we are satisfied that this is not the case to answer such an important question because our decision under either articulation of the Rule 12(b)(6) motion to dismiss standard would be the same. Accordingly, we leave the Twombly and Iqbal conundrum for another day.

### Analysis

### Standing

The Superior Court justice held that plaintiffs lacked standing to challenge the assignment of the mortgage on their home. Recently, this Court held that, in limited circumstances, "homeowners in Rhode Island have standing to challenge the assignment of mortgages on their homes to the extent necessary to contest the foreclosing entity's authority to foreclose." Mruk v. Mortgage Electronic Registration Systems, Inc., No. 2012-282-A., slip op. at 13 (R.I., filed Dec. 19, 2013). The plaintiffs in this case contest Aurora's authority to foreclose, alleging that the mortgage was not validly assigned. In light of Mruk, we are satisfied that plaintiffs have standing to prosecute this claim.

### The Motion to Dismiss

The Superior Court justice concluded that, even if plaintiffs had standing, their "allegations with respect to the invalidity of the assignment of the Mortgage interest are merely

'conclusory statements' which are insufficient to survive a motion to dismiss." Before this Court, defendants contend that "the Superior Court utilized the Rhode Island pleading standard." Although the Superior Court justice stated that "[p]laintiffs' [c]omplaint cannot survive a Rule 12(b)(6) motion even under the more forgiving pleading standard articulated in [Barrette v. Yakavonis, 966 A.2d 1231 (R.I. 2009) and Palazzo v. Alves, 944 A.2d 144 (R.I. 2008)]," at the crucial points of the decision, the Superior Court justice employed Twombly and Iqbal. Regardless of which standard the decision rests upon, we conclude that the allegations in the complaint are sufficient to survive a motion to dismiss under both our traditional standard and the newer Federal standard.

Paragraph 12 of the complaint alleges: "On or about September 10, 2010, MERS attempted to assign this Mortgage to Aurora. * * * Theodore Schultz signed. Theodore Schultz had no authority to assign." Thus, the plaintiffs have alleged that the one person who signed the mortgage assignment did not have the authority to do so. This allegation is buttressed by other allegations in the complaint. Paragraph 13 states that "Theodore Schultz was an employee of Aurora, not a Vice-President or Assistant Secretary of MERS." Paragraph 17 alleges that "MERS did not order the assignment to Aurora." Finally, paragraph 19 contends that "[n]o power of attorney from MERS to either Theodore Schultz or Aurora is recorded and referenced in the subject assignment." These allegations, if proven, could establish that the mortgage was not validly assigned, and, therefore, Aurora did not have the authority to foreclose on the property. Accordingly, the complaint states a plausible claim upon which relief can be granted, and it is not "clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim." Palazzo, 944 A.2d at 149-50 (quoting Ellis, 586 A.2d at 1057); see Iqbal, 556 U.S. at

678-80 (articulating plausibility standard).   Thus, the defendants' Rule 12(b)(6) motion was improperly granted.

<div align="center">

**Conclusion**

</div>

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court and remand the case for further proceedings.



### RHODE ISLAND SUPREME COURT CLERK'S OFFICE

*Clerk's Office Order/Opinion Cover Sheet*

---

**TITLE OF CASE:**    William Chhun et al. v. Mortgage Electronic Registration Systems, Inc., et al.

**CASE NO:**    No. 2012-298-Appeal.
(PC 11-4547)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    February 3, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT:**

Associate Justice Allen P. Rubine

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  George E. Babcock, Esq.

For Defendants:  Charles A. Lovell, Esq.

# Exhibit 6

# Exhibit 6

**#2011-044**

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY
WASHINGTON, D.C.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

FEDERAL DEPOSIT INSURANCE CORPORATION
WASINGTON, D.C.

OFFICE OF THRIFT SUPERVISION
WASHINGTON, D.C.

FEDERAL HOUSING FINANCE AGENCY
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of: ) | |
| ) | OCC No. AA-EC-11-20 |
| MERSCORP, Inc., and the ) | |
| Mortgage Electronic Registration Systems, Inc., ) | Board of Governors |
| Reston, Virginia ) | Docket Nos. 11-051-B-SC-1, |
| ) | 11-051-B-SC-2 |
| ) | |
| ) | FDIC-11-194b |
| ) | |
| ) | OTS No. 11-040 |
| ) | |
| | FHFA No. EAP-11-01 |

## CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), the Board of Governors of the Federal Reserve System, Washington, D.C.

("Board of Governors"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of

Thrift Supervision ("OTS"), and the Federal Housing Finance Agency ("FHFA") (collectively

the "Agencies"), as part of an interagency horizontal review of major residential mortgage servicers and mortgage service providers, have conducted an examination of MERSCORP, Inc. ("MERSCORP"), and of its wholly-owned subsidiary corporation, Mortgage Electronic Registration Systems, Inc., ("MERS"), both of which provide various services to financial institutions related to tracking and registering residential mortgage ownership and servicing, acting as mortgagee of record in the capacity of nominee for lenders, and initiating foreclosure actions. The Agencies have identified certain deficiencies and unsafe or unsound practices by MERS and MERSCORP that present financial, operational, compliance, legal and reputational risks to MERSCORP and MERS, and to the participating Members. Members are institutions that use MERSCORP's and MERS' services and have agreed to abide by MERSCORP's Rules of Membership (the "Rules"). The Members include depository institutions regularly examined by, or subsidiaries or affiliates of depository institutions subject to examination by the OCC, the Board of Governors, the FDIC, the OTS, and other appropriate Federal banking agencies, as defined by subsection 1(b)(1) of the Bank Service Company Act, 12 U.S.C. § 1861(b)(1), and Fannie Mae and Freddie Mac, which are subject to examination by the FHFA, (collectively "Examined Members"). The Agencies have informed MERS and MERSCORP of the findings resulting from the examination. MERS and MERSCORP have begun implementing procedures to remediate the practices addressed in this Order.

MERS and MERSCORP, by and through their duly elected and acting Boards of Directors (collectively the "Boards"), have executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011 ("Stipulation and Consent"), that is accepted by the Agencies. By this Stipulation and Consent, which is incorporated by reference, MERS and MERSCORP have consented to the issuance of this Consent Cease and Desist Order ("Order"),

MERS Consent Order

pursuant to 12 U.S.C. §§ 1818(b), 1867(c)-(d), and 4631, by the Agencies, consistent with the Stipulation and Consent. MERS and MERSCORP have committed to take all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the Agencies.

## ARTICLE I

## JURISDICTION

For purposes of this Consent Order:

(1)    MERS and MERSCORP are providers of services to Examined Members within the meaning of 12 U.S.C. § 1867(c).

(2)    MERS and MERSCORP are each an "institution-affiliated party" within the meaning of 12 U.S.C. § 1813(u) by virtue of MERS acting as agent for lenders (who include Examined Members) with respect to serving as mortgagee in a nominee capacity for the lender, and are each an "entity-affiliated party" within the meaning of 12 U.S.C. § 4502(11) by virtue of MERS acting as agent for Fannie Mae and Freddie Mac with respect to serving as mortgagee in a nominee capacity for the owner of residential mortgage loans.

(3)    The OCC, the Board of Governors, the OTS, and the FDIC examined the services provided by MERS and MERSCORP to Examined Members pursuant to the provisions of 12 U.S.C. § 1867(c), on behalf of themselves and other appropriate Federal banking agencies as defined in 12 U.S.C. § 1861(b)(1).

(4)    The Agencies have authority to enter into this Consent Order pursuant to 12 U.S.C. §§ 1818(b), 1867(c)-(d), and 4631.

## ARTICLE II

## AGENCIES' FINDINGS

The Agencies find, and MERS and MERSCORP neither admit nor deny, the following:

(1)     MERS is a wholly-owned subsidiary of MERSCORP.  MERSCORP's shareholders include federally regulated financial institutions that own and/or service residential mortgages, including Examined Members, and other primary and secondary mortgage industry participants.

(2)     MERSCORP operates a national electronic registry that tracks beneficial ownership interests and servicing rights associated with residential mortgage loans and any changes in those interests or rights.  There are approximately 5,000 participating Members, of which 3,000 are residential mortgage servicers.  Members register loans and report transfers, foreclosures, and other changes to the status of residential mortgage loans on the MERS System. There are currently approximately 31 million active residential mortgage loans registered on the MERS System.  Examined Members receive a substantial portion of the services provided by MERSCORP and MERS.

(3)     MERS serves as mortgagee of record and nominee for the participating Members in local land records.  MERS takes action as mortgagee through documents executed by "certifying officers" of MERS.  MERS has designated these individuals, who are officers or employees of Members or certain third-parties who have contractual relationships with Members, as officers of MERS.  By virtue of these designations, the certifying officers execute legal documents in the name of MERS, such as mortgage assignments and lien releases.

(4)    In connection with services provided to Examined Members related to tracking, and registering residential mortgage loans and initiating foreclosures ("residential mortgage and foreclosure-related services"), MERS and MERSCORP:

(a)    have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; and

(b)    have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members.

(5)    By reason of the conduct set forth above, MERS and MERSCORP engaged in unsafe or unsound practices that expose them and Examined Members to unacceptable operational, compliance, legal, and reputational risks.

Pursuant to the authority vested in them by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §§ 1818(b), the Bank Service Company Act, 12 U.S.C. § 1867(c)-(d), and the Federal Housing Enterprises Financial Safety and Soundness Act, 12 U.S.C. § 4631, the Agencies hereby ORDER that:

## ARTICLE III

## COMPLIANCE COMMITTEE

(1)    Within twenty (20) days of this Order, the Boards of Directors of MERSCORP and MERS (the "Boards") shall each establish and thereafter maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of MERS or MERSCORP or any of their subsidiaries or affiliates.  In the event of a change of the

membership, the name of any new committee member shall be submitted to the OCC Deputy

Comptroller for Large Bank Supervision ("Deputy Comptroller"). The Compliance Committee

shall be responsible for monitoring and coordinating MERS' and MERSCORP's compliance

with the terms and provisions of this Order. The Compliance Committee shall meet at least

monthly and maintain minutes of its meetings.

      (2)    Within ninety (90) days of this Order, and within thirty (30) days of the end of

each calendar quarter thereafter, the Compliance Committee shall submit a written progress

report to the Boards setting forth in detail its actions taken to comply with each Article of this

Consent Order, and the results and status of those actions.

      (3)    The Boards shall forward a copy of the Compliance Committee's report, with any

additional comments by the Boards, to the Deputy Comptroller and the OCC Examiner-in-

Charge within ten (10) days of receiving such report.

<div align="center">

ARTICLE IV

<u>ACTION PLAN</u>

</div>

      (1)    Within ninety (90) days of this Order, MERS and MERSCORP shall jointly

develop and submit to the Deputy Comptroller an acceptable plan containing a complete

description of the actions that are necessary and appropriate to achieve compliance with the

terms and provisions of this Order ("Action Plan"), as well as the resources to be devoted to the

planned actions, with respect to services provided to Examined Members. In the event the

Deputy Comptroller requests MERS or MERSCORP to revise the Action Plan, they shall

immediately make the requested revisions and resubmit the Action Plan to the Deputy

Comptroller. Following acceptance of the Action Plan by the Deputy Comptroller, MERS and

MERSCORP shall not take any action that would constitute a significant deviation from, or material change to the requirements of the Action Plan, or this Order, unless and until MERS or MERSCORP have received a prior written determination of no supervisory objection from the Deputy Comptroller.

      (2)     The Boards shall ensure that MERS and MERSCORP achieve and thereafter maintain compliance with this Order, including, without limitation, successful implementation of the Action Plan.  The Boards shall further ensure that, upon implementation of the Action Plan, MERS and MERSCORP achieve and maintain effective residential mortgage and foreclosure-related services on behalf of Examined Members, as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions.  In order to comply with these requirements, the Boards shall:

           (a)     require the timely reporting by MERS and MERSCORP management of such actions taken to comply with this Order and/or directed by either Board to be taken pursuant to this Order;

           (b)     follow-up on any compliance issues with such actions in a timely and appropriate manner; and

           (c)     require corrective action be taken in a timely manner for any non-compliance with such actions.

      (3)     The Action Plan shall address, at a minimum:

           (a)     the capability of the Boards and senior management to ensure that MERS and MERSCORP are operated in a safe and sound manner in accordance with applicable laws, regulations and requirements of this Order;

(b)    development and implementation of a strategic plan to include a comprehensive review of business operations, including the risks associated with each business line, and recommendations to implement the strategic plan;

(c)    consistent with the strategic plan, development and implementation of a financial plan to ensure that MERSCORP and MERS have adequate financial strength to support business operations related to Examined Members.  The financial plan, at a minimum, shall address:

(i)    any need for additional capital, including the amount and source of capital;

(ii)    the identification, measurement, monitoring and control of funding and liquidity risk; and

(iii)    a profit and budget plan to include specific goals to reduce discretionary expenses and improve and sustain earnings, as well as maintain adequate reserves for contingency risks and liabilities;

(d)    development and implementation of a comprehensive litigation strategy to effectively manage lawsuits and legal challenges involving MERS and MERSCORP, regardless of whether MERSCORP or MERS is a named party, including early identification and tracking of such lawsuits and challenges;

(e)    development and implementation of a communication plan to communicate effectively and in a timely manner with MERSCORP's shareholders, Members including Examined Members, and relevant external parties;

(f)    development and implementation of a compliance and quality assurance program for ensuring that Examined Members implement and follow all of the Rules, including

adherence to the requirements set forth in MERS Announcement 2011-01, dated February 16, 2011;

        (g)    development and implementation of a plan to ensure that MERS certifying officers are transitioned expeditiously onto the Corporate Resolution Management System ("CRMS") in accordance with MERS' current certifying officer policy and process;

        (h)    development and implementation of appropriate standards to maintain separation of corporate functions between MERS and MERSCORP;

        (i)    review of the effectiveness of the Rules, and related Procedures, Terms and Conditions to determine what, if any, additions, amendments, or deletions are appropriate;

        (j)    development and implementation of enhanced information reporting practices to senior management from lower levels of each organization, and from senior management to the Boards to ensure that significant issues are properly identified and escalated, and that corporate actions are considered, taken in a timely fashion, ands properly documented;

        (k)    any Matter Requiring Attention in the OCC Supervisory Letter No. MERS 2011-01, dated January 19, 2011, that addresses an issue that is not otherwise covered by provisions of this Order; and

        (l)    development of contingency plans to address issues that arise with respect to any of the foregoing elements of the Action Plan, including plans that address operational continuity issues in the normal course of business and in a stressed environment.

    (4)    The Action Plan shall specify timelines for completion of each of the requirements of this Order. The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

**ARTICLE V**

**BOARD AND MANAGEMENT SUPERVISION**

(1)      Within thirty (30) days from the effective date of this Order, MERSCORP and

MERS shall engage an independent third party, acceptable to the Deputy Comptroller, with the

appropriate expertise and qualifications to analyze and assess the directors, officers, management

and staffing needs with respect to any and all services provided by MERSCORP and MERS to

Examined Members, in order to operate MERS and MERSCORP in a safe and sound manner

and achieve compliance with this Order.  The engagement shall provide that the required

analysis and assessment be completed and summarized in a written report to the Boards

("Management Report") within sixty (60) days of the third party's engagement, with a copy

simultaneously delivered to the Deputy Comptroller.  At a minimum, the Management Report

shall:

(a)      identify the type and number of positions needed appropriately to manage

and supervise all services provided to Examined Members, including, but not limited to: (i) the

orderly and expeditious transitioning of Examined Members onto the CRMS; (ii) the enhanced

communication and coordination with Examined Members required by the Communications

Plan; and (iii) registration or tracking systems, assignment and/or foreclosure services, detailing

any vacancies and additional staffing needs with appropriate consideration to the scope and

complexity of the services provided, for the number of Examined Members and MERS certifying

officers who will need to complete the certification process, and for the size of the portfolios for

which these services are provided;

(b)      identify the type and number of officer and staff positions needed to

ensure compliance with all applicable federal and state laws and regulations and material

contractual requirements, as well as to implement any newly established or revised plans, policies, procedures, processes and systems required by this Order, detailing any vacancies, additional needs and/or unit re-alignments required with appropriate consideration to the scope and complexity of the services provided as well as the size of the portfolios for which these services are provided;

(c)    identify and address the appropriateness of the duties, responsibilities, authority and accountability of each professional position, giving due consideration to the relevant knowledge, skills, abilities, and experience of the incumbent (if any);

(d)    present a clear and concise description of the relevant knowledge, skills, abilities, and experience necessary for each officer position, including delegations of authority and performance objectives, including whether the incumbent (if any) has the requisite knowledge, skills, abilities, and experience for such position;

(e)    recommend a plan to recruit and retain directors, officers, management and staff consistent with the independent third party's analysis and assessment;

(f)    recommend any reorganization or realignment of directors, officers, management and staff consistent with the independent third party's analysis and assessment;

(g)    recommend any additional training and development needs as well as a plan to provide such training and development to appropriate directors, officers, management and staff; and

(h)    recommend procedures to periodically review and update the Management Plan required by subparagraph (3) below and assess the performance of all directors, officers, management and staff.

(2)      MERSCORP and MERS shall provide a copy of the proposed engagement letter or contract with the third party to the Deputy Comptroller for review and non-objection prior to entering into the engagement.

(3)      Within thirty (30) days of receipt of the Management Report, MERSCORP and MERS shall jointly develop a written plan of action (the "Management Plan") in response to each recommendation contained in the Management Report and a time frame for completing each action.  The Management Plan and any subsequent modification(s) thereto shall be submitted to the Deputy Comptroller for review and non-objection.

(4)      The Boards shall immediately establish a schedule of regular Board meetings to be held at least once every calendar quarter.

## ARTICLE VI

## COMMUNICATIONS RELATING TO LEGAL PROCEEDINGS

(1)      Within sixty (60) days of this Order, MERS and MERSCORP shall jointly develop and submit to the Deputy Comptroller a plan for communicating with Members concerning significant legal proceedings or issues.  The plan shall include:

(a)  a process for notifying and informing Examined Members concerning significant legal proceedings and legal issues that relate to the functioning of MERS, MERSCORP, or the Examined Members' interests with respect to MERS or MERSCORP, including, but not limited to significant favorable or adverse decisions, within a short time period after the issue arises or a decision is issued;

(b)  a process that provides sufficient incentives for Members to inform MERSCORP and MERS of the filing of all lawsuits brought in MERS' name or to which MERS is a named party, and periodically update MERS concerning the status of such lawsuit;

(c) a process to track all legal proceedings brought in MERS' name, in which MERS is a named party, or which involve legal issues that affect the interests of MERS, MERSCORP, or Examined Members with respect to MERSCORP and MERS;

(d)  a process to ensure an appropriate response by MERS to legal proceedings brought in MERS' name, in which MERS is a named party, or which involve legal issues that affect the interests of MERS, MERSCORP, or Examined Members with respect to MERSCORP and MERS;

(e)  proposed revisions as necessary to the MERSCORP Rules to implement these processes.

(2)    Within thirty (30) days of this Order, MERSCORP and MERS shall establish Legal Risk Subcommittees of the Boards, which shall make regular reports to the Boards on outstanding legal issues and pending litigation that affect the interests of MERS, MERSCORP, and Examined Members with respect to MERSCORP and MERS, and provides analysis and recommendations concerning litigation contingency reserves.

## ARTICLE VII

## CERTIFYING OFFICERS

(1)    Within sixty (60) days of this Order, MERS shall prepare and submit a plan to the Deputy Comptroller to strengthen its governance processes applicable to MERS certifying officers with respect to Examined Members.  The plan shall include, but not be limited to:

       (a)  policies and processes to designate or certify individuals as authorized MERS certifying officers, and that only such individuals act in such capacity;

       (b)  policies, processes and resources to track the identity and activities of MERS certifying officers and to ensure their compliance with the Rules and related requirements, including the requirements of the CRMS;

       (c)  policies, processes and resources to register third-party MERS certifying officers who are acting for Examined Members;

       (d)  policies, processes and resources to ensure the adequacy and appropriateness of training for certifying officers;

       (e)  policies, processes, and resources to ensure that Examined Members comply with MERS Membership Rule 8 and MERS Announcement 2011-01; and

       (f)  policies, processes, and resources to ensure that Examined Members and third parties can quickly and accurately determine if specific individuals are designated to act as authorized MERS certifying officers.

## ARTICLE VIII

## QUALITY ASSURANCE AND DATA INTEGRITY

(1)     Within sixty (60) days of this Order, MERS and MERSCORP shall jointly prepare and submit a plan to the Deputy Comptroller to strengthen its policies, processes, resources and controls for data standards and quality assurance of information submitted to and contained in MERSCORP data systems.  The plan shall include, but not be limited to:

       (a)  an assessment and determination of which data elements are necessary to MERS  and MERSCORP operations and should be mandatory reporting requirements

("mandatory reporting fields") for Examined Members.  The plan shall include elimination of collection of existing data elements currently reported by Members that are not reasonably related to MERS or MERSCORP operations;

        (b)  policies, processes and resources to ensure the accuracy and reliability of data reported to MERSCORP, including but not limited to system-to-system reconciliations of all MERS mandatory reporting fields, frequent capture of all reject/warning reports associated with registrations, transfers, and status updates on open-item aging reports, and an accurate determination of foreclosures pending in MERS' name;

        (c)  adoption or revision of an adequate written quality assurance procedures manual and processes to ensure appropriate implementation of the quality assurance program described in the quality assurance procedures manual;

        (d)  policies, processes and resources to ensure that Examined Members  comply with MERSCORP approved quality assurance plans submitted to MERSCORP by Examined Members and provide to MERSCORP an annual independent report demonstrating their adherence to their MERSCORP approved quality assurance program, including submission of all mandatory MERS data reporting fields, and processes for system-to-system reconciliation and reject/warning error correction.

# ARTICLE IX

## eREGISTRY

(1)    Within ninety (90) days from the effective date of this Order, the MERSCORP Board shall obtain an independent, external review of and recommendations regarding the eRegistry system of recording electronic notes.  The review and recommendations shall consider

whether appropriate policies, procedures, and operating controls are in place to ensure effective operation of eRegistry. Within sixty (60) days of completion of the review and recommendations required by this Article, MERSCORP shall submit to the Deputy Comptroller for review and supervisory non-objection a plan describing actions necessary to implement any changes to applicable policies, procedures and controls as a result of the findings of the audit. In the event the Deputy Comptroller asks MERSCORP to revise the plan required by this Article, MERSCORP shall immediately make the requested revisions and resubmit the plan.

## ARTICLE X

## COMMUNICATIONS PLAN

(1)      Within sixty (60) days from the effective date of this Order, MERSCORP shall develop, adopt and implement a plan designed to enhance communications and coordination with its Examined Members with respect to their duties and responsibilities as set forth in the Rules and related Procedures, Terms and Conditions ("Communications Plan"). The Communication Plan shall, at a minimum, be designed to ensure that all Examined Members and appropriate personnel within an Examined Member are aware of, and can comply with current Rules and related Procedures, Terms and Conditions and any new or revised Rules or related Procedures, Terms and Conditions on an ongoing basis and to ensure that Examined Members and appropriate personnel within or retained by an Examined Member are aware of, and are able to comply with, the requirement to advise MERSCORP of the initiation of litigation naming or otherwise involving MERS, MERSCORP and/or one of their subsidiaries and coordinate the defense or prosecution of such litigation with MERSCORP.

## ARTICLE XI

## <u>APPROVAL, IMPLEMENTATION AND REPORTS</u>

(1)     MERS and MERSCORP shall submit the written assessments, reports and plans required by this Order for review and written determination of no supervisory objection to the Deputy Comptroller and within the applicable time periods set forth in the Order.  MERS and MERSCORP shall adopt the plans required by this Order upon receipt of a determination of no supervisory objection from the OCC, and shall immediately make any revisions requested by the Deputy Comptroller.  Upon adoption, MERS and MERSCORP shall immediately implement the plans required by this Order and thereafter fully comply with them.

(2)     During the term of this Order, the required plans, programs, policies and procedures shall not be amended or rescinded in any material respect without the prior written approval of the Deputy Comptroller.

(3)     During the term of this Order, MERS and MERSCORP shall revise the required plans, programs, policies and procedures as necessary to incorporate new or changes to applicable federal and state laws, rules, regulations, guidelines, court orders, and contractual or other requirements.

(4)     The Boards shall ensure that MERS and MERCORP have processes, personnel, resources, and control systems to ensure implementation of and adherence to the plans, programs, policies and procedures required by this Order.

(5)     Within thirty (30) days after the end of each calendar quarter following the date of this Order, MERS and MERSCORP shall submit to the Deputy Comptroller a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information

sufficient to validate compliance with this Order, based on a testing program acceptable to the

OCC that includes, if required by the OCC, validation by third-party independent consultants

acceptable to the Deputy Comptroller. The Deputy Comptroller may, in writing, discontinue the

requirement for progress reports or modify the reporting schedule.

      (6)    All communication regarding this Order shall be sent to:

          (a)    Joseph H. Evers
                Deputy Comptroller for Large Bank Supervision
                Office of the Comptroller of the Currency
                250 E Street, SW
                Washington, DC 20219

With copy to:

          (b)    Stephen Jackson
                National Bank Examiner
                Office of the Comptroller of the Currency
                250 E Street, SW
                Washington, DC 20219

# ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

      (1)    If MERS or MERSCORP contend that compliance with any provision of this

Order would not be feasible or legally permissible, or requires an extension of any timeframe

within this Order, the Boards shall submit a written request to the Deputy Comptroller asking for

relief. Any written requests submitted pursuant to this Article shall include a statement setting

forth in detail the special circumstances that prevent either MERS or MERSCORP from

complying with a provision, that require the Deputy Comptroller to exempt either of them from a

provision, or that require an extension of a timeframe within this Order.

MERS Consent Order                -18-

(2)      All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which MERS or MERSCORP relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.


## ARTICLE XIII

### OTHER PROVISIONS

(1)      Although this Order requires MERS and MERSCORP to submit certain actions, reports and plans for the review or a written determination of no supervisory objection by the Deputy Comptroller, the Boards have the ultimate responsibility for proper and sound management of MERS and MERSCORP.

(2)      In each instance in this Order in which MERS or MERSCORP are required to ensure adherence to, and undertake to perform certain obligations, it is intended to mean that the Boards shall:

(a)  authorize and adopt such actions on behalf of MERS and MERSCORP as may be necessary for them to perform their obligations and undertakings under the terms of this Order;

(b)  require the timely reporting of MERS and MERSCORP management of such actions directed by either Board to be taken under the terms of this Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

(d)  require corrective action be taken in a timely manner of any material non-compliance with such actions.

MERS Consent Order

(3)    If, at any time, the Comptroller, the Board of Governors, the FDIC, the OTS, or the FHFA deems it appropriate in fulfilling the responsibilities placed upon them by the several laws of the United States to undertake any action affecting MERS or MERSCORP, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent either any of them from so doing.

(4)    This Order is and shall become effective upon its execution by the Agencies through their authorized representatives whose hands appear below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(5)    Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise

(6)    This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. §§ 1818(b), 1867(d), and 4631 and expressly does not form, and may not be construed to form, a contract binding the Comptroller, the Board of Governors, the FDIC, the OTS, or the FHFA or the United States.  Without limiting the foregoing, nothing in this Order shall affect any action against MERS, MERSCORP or officers, directors, or employees by a financial regulatory agency, the United States Department of Justice or any other law enforcement agency, to the extent permitted under applicable law.

(7)    The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(8)    Nothing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

   (9) The provisions of this Order shall be binding upon MERSCORP and MERS and their successors and assigns.

   (10) MERS and MERSCORP consent to the issuance of this order before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.

IT IS SO ORDERED, this 13th day of April, 2011.

OFFICE OF THE COMPTROLLER OF THE CURRENCY

By: _/s/Joseph H. Evers_____
   Joseph H. Evers
   Deputy Comptroller for Large Bank Supervision

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

By: _/s/Jennifer. J. Johnson_____
   Jennifer J. Johnson
   Secretary of the Board

**FEDERAL DEPOSIT INSURANCE CORPORATION**

By:  /s/Thomas J. Dujenski
       **Thomas J. Dujenski**
       **Regional Director**
       **Atlanta Regional Office**

**OFFICE OF THRIFT SUPERVISION**

By:  /s/Thomas A. Barnes
       **Thomas A. Barnes**
       **Deputy Director**
       **Examinations, Supervision and Consumer Protection**

**FEDERAL HOUSING FINANCE AGENCY**

By:  /s/Christopher H. Dickerson
       **Christopher H. Dickerson**
       **Acting Deputy Director for Enterprise Regulation**

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY
WASHINGTON, D.C.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

FEDERAL DEPOSIT INSURANCE CORPORATION
WASINGTON, D.C.

OFFICE OF THRIFT SUPERVISION
WASHINGTON, D.C.

FEDERAL HOUSING FINANCE AGENCY
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of: ) | |
| ) | OCC No. AA-EC-11-20 |
| MERSCORP, Inc., and the ) | Board of Governors |
| Mortgage Electronic Registration Systems, Inc., ) | Docket Nos. 11-051-B-SC-1, |
| Reston, Virginia ) | 11-051-B-SC-2 |
| ) | |
| ) | FDIC-11-194b |
| ) | |
| ) | OTS No. 11-040 |
| ) | |
| ) | FHFA No. EAP-11-01 |
| ) | |

STIPULATION AND CONSENT TO THE ISSUANCE
OF A CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"

or "OCC"), and the Board of Governors of the Federal Reserve System ("Board of

Governors"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift

Supervision ("OTS"), and the Federal Housing Finance Agency ("FHFA") (collectively

MERS Stipulation

the "Agencies") intend to impose a cease and desist order on the Mortgage Electronic

Registration Systems, Inc. ("MERS"), and its parent company, MERSCORP, Inc.

("MERSCORP"), pursuant to 12 U.S.C. § 1818(b),12 U.S.C. § 1867(c)-(d), and 12

U.S.C. § 4631, for certain deficiencies and unsafe or unsound practices by MERS and

MERSCORP that present financial, operational, compliance, legal and reputational risks t

MERSCORP and MERS, and to MERSCORP's members.

MERS and MERSCORP, in the interest of compliance and cooperation, enter into

this Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and

consent to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Agencies, through their authorized

representatives, and MERS and MERSCORP, through their duly elected and acting

Boards of Directors, stipulate and agree to the following:


## ARTICLE I
## JURISDICTION

For purposes of this Stipulation and the Consent Order:

(1)     MERS and MERSCORP are providers of services to depository

institutions regularly examined by, or subsidiaries or affiliates of depository institutions

subject to examination by the OCC, the Board of Governors, the FDIC, the OTS, and

other appropriate Federal banking agencies, within the meaning of the Bank Service

Company Act of 1962, 12 U.S.C. § 1867(c).

(2)     MERS and MERSCORP are each an "institution-affiliated party" within

the meaning of 12 U.S.C. § 1813(u), and are each an "entity-affiliated party" within the

meaning of 12 U.S.C. § 4502(11).

MERS Stipulation

2

(3)     The OCC, the Board of Governors, FDIC and OTS examined the services provided by MERS and MERSCORP to national banks and other financial institutions pursuant to the provisions of 12 U.S.C. § 1867(c).

(4)     The Agencies have authority to enter into this Consent Order pursuant to 12 U.S.C. §§ 1818(b), 1867(c)-(d) and 4631.

## ARTICLE II
## AGREEMENT

(1)     MERS and MERSCORP, without admitting or denying any wrongdoing, consent and agree to issuance of the Consent Order by the Agencies.

(2)     MERS and MERSCORP consent and agree that the Consent Order shall (a) be deemed an "order issued with the consent of the . . . institution-affiliated part[ies]" pursuant to 12 U.S.C. § 1818(h)(2) and an order to which an entity-affiliated party consents pursuant to 12 U.S.C. § 4633(a)(4); and (b) become effective upon its execution by the Agencies through their authorized representatives, and (c) be fully enforceable by the Agencies pursuant to 12 U.S.C. §§ 1818(i) and 1867(d), and 12 U.S.C. § 4631(f) and 4635.

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Agencies may enforce any of the commitments or obligations herein undertaken by MERS or MERSCORP under their supervisory powers, including 12 U.S.C. §§ 1818(i) and 1867(c)-(d), and 12 U.S.C. §§ 4631 and 4635, and not as a matter of contract law. MERS and MERSCORP expressly acknowledge that MERS, MERSCORP, and the Agencies have no intention to enter into a contract.

MERS Stipulation

(4)      MERS and MERSCORP declare that no separate promise or inducement of any kind has been made by the Agencies, or by their agents or employees, to cause or induce MERS or MERSCORP to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)      MERS and MERSCORP expressly acknowledge that no officer or employee of the Agencies has statutory or other authority to bind the United States, the United States Treasury Department, the Agencies, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Agencies' exercise of their supervisory responsibilities.

(6)      The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.  Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

### ARTICLE III
### WAIVERS

(1)      MERS and MERSCORP, by consenting to this Stipulation, waive:

(a)      the issuance of a Notice of Charges pursuant to 12 U.S.C. §§ 1818(b) and 4631(c);

(b)      any and all procedural rights available in connection with the issuance of the Consent Order;

(c)      all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 U.S.C. § 1867, 12 C.F.R. Part 19, and 12 U.S.C. § 4631(c);

MERS Stipulation

4

(d)     all rights to seek any type of administrative or judicial review of the Consent Order;

(e)     any and all claims for fees, costs or expenses against the Agencies, or any of their agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(f)     any and all rights to challenge or contest the validity of the Consent Order.

## ARTICLE IV
## OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Agencies from taking any other action affecting MERS or MERSCORP if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the Agencies to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, and neither MERS nor MERSCORP shall contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

MERS Stipulation

5

(3)     The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the signatory Agencies as their representatives, have hereunto set their hands on behalf of the Agencies.


OFFICE OF THE COMPTROLLER OF THE CURRENCY

/s/Joseph H. Evers                                      April 13, 2011
_____          _____
By: Joseph H. Evers                                          Date
      Deputy Comptroller for
      Large Bank Supervision


BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

/s/Jennifer J. Johnson                                  April 13, 2011
_____          _____
By: Jennifer J. Johnson                                      Date
      Secretary of the Board



FEDERAL DEPOSIT INSURANCE CORPORATION

 /s/Thomas J. Dujenski                                 April 13, 2011
_____          _____
By: Thomas J. Dujenski                                       Date
      Regional Director
      Atlanta Regional Office


MERS Stipulation

OFFICE OF THRIFT SUPERVISION

/s/Thomas A. Barnes                                            April 13, 2011
By: Thomas A. Barnes                                           Date
    Deputy Director
    Examinations,
    Supervisions and
    Consumer Protection


FEDERAL HOUSING FINANCE AGENCY


  /s/Christopher H. Dickerson                              April 13, 2011
By: Christopher H. Dickerson                                   Date
    Acting Deputy Director for Enterprise Regulation

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Boards of

Directors of MERS and MERSCORP, have hereunto set their hands on behalf of MERS

and MERSCORP.

For MERSCORP:


  /s/Diane Citron                                          April 12, 2011
Diane Citron                                                   Date
MERSCORP


  /s/John Courson                                          April 12, 2011
John Courson                                                   Date
MERSCORP


  /s/Joe Jackson                                           April 12, 2011
Joe Jackson                                                    Date
MERSCORP
MERS Stipulation

7

__/s/Brian McCrackin_____          April 12, 2011_____
Brian McCrackin                     Date
MERSCORP


__/s/Kurt Pfotenhauer_____         April 12, 2011_____
Kurt Pfotenhauer                    Date
MERSCORP


__/s/Robert Reynolds_____          April 12, 2011_____
Robert Reynolds                     Date
MERSCORP


__/s/Joseph Rossi_____             April 12, 2011_____
Joseph Rossi                        Date
MERSCORP


__/s/Steven Stein_____             April 12, 2011_____
Steven Stein                        Date
MERSCORP


__/s/Marianne Sullivan_____        April 12, 2011_____
Marianne Sullivan                   Date
MERSCORP


__/s/Larry Washington_____         April 12, 2011_____
Larry Washington                    Date
MERSCORP


For MERS:


MERS Stipulation

8

   /s/John Courson                                    April 12, 2011
John Courson                                              Date
MERS


   /s/Edward Kramer                                   April 12, 2011
Edward Kramer                                             Date
MERS


   /s/Kurt Pfotenhauer                                April 12, 2011
Kurt Pfotenhauer                                          Date
MERS


   /s/Marianne Sullivan                               April 12, 2011
Marianne Sullivan                                         Date
MERS


   /s/Joseph Rossi                                    April 12, 2011
Joseph Rossi                                              Date
MERS


MERS Stipulation

9